**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHAWN KNIGHTLY, | ) | |
| | ) | 2:19-cv-00304-RJC |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Judge Robert J. Colville |
| | ) | |
| CENTIMARK CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION</u>**

Robert J. Colville, United States District Judge

Before the Court is the Motion for Summary Judgment (ECF No. 80) filed by Defendant CentiMark Corporation ("CentiMark"). CentiMark argues that it is entitled to summary judgment in its favor with respect to each of the four claims brought against CentiMark by Plaintiff Shawn Knightly ("Knightly") in his Complaint (ECF No. 1-1). CentiMark asserts that it is entitled to summary judgment because Knightly has failed to set forth sufficient evidence to create a genuine issue of material fact as to any of his claims. Mot. 1, ECF No. 80. The Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332(a). CentiMark's Motion for Summary Judgment has been fully briefed, and is ripe for disposition.

## I.    Factual Background & Procedural History

In his Complaint, Knightly asserts the following claims against CentiMark: (1) violation of the Massachusetts Wage Act, M.G.L. c. 149 §§ 148, 150 (Count One); (2) breach of contract (Count Two); (3) breach of the covenant of good faith and fair dealing (Count Three); and (4) quantum meruit (Count Four). As explained in the Court's previous Memorandum Order in this case, Knightly asserts that, at all relevant times, Knightly was a salaried and commission-based CentiMark employee who sold roofing projects. Mem. Order 2, ECF No. 70. Knightly claims

1

that CentiMark manipulated data stored within CentiMark's database, which is used to calculate commission payouts, to avoid paying Knightly full commissions for specific projects on which Knightly worked.  *Id*.  Specifically, Knightly claims that CentiMark's database calculates job profitability, and that CentiMark modified records within the database to increase overhead costs for certain jobs and, thus, decrease profitability and Knightly's corresponding commission payouts. *Id*.

Unless otherwise noted, the following facts are not in dispute:

CentiMark is a roofing and flooring contractor headquartered in Canonsburg, PA.  Resp. to Concise Statement ¶ 1, ECF No. 92.  In August of 2011, CentiMark hired Knightly as a Technical Representative at CentiMark's Boston office.  *Id.* at ¶ 3.  Knightly was later promoted to Assistant Project Manager.  *Id.* at ¶ 4.  In October 2012, Knightly was subsequently promoted again, this time to Senior Project Manager, at which time he became subject to CentiMark's "Dual Rate Commission Plan."  *Id.* at ¶ 5.   Project managers such as Knightly are responsible for generating roofing project proposals, communicating and documenting any changes in the scope of work to CentiMark's customers, and working to ensure that the customers pay their final invoices.  *Id.* at ¶ 8.  Knightly voluntarily resigned his employment with CentiMark in December of 2017.  *Id.* at ¶ 6.

CentiMark keeps track of the sale prices for roofing projects, the profit (or loss) from projects, and other amounts, such as the billable rate on projects, in an effort to track its various regions and to report on its audited financials.  Resp. to Concise Statement ¶ 9, ECF No. 92.  Under the Dual Rate Commission Plan, CentiMark takes into account the gross profit margin and the billable rate of projects to determine the salesperson's commission associated with each project

sold.[1]  *Id.* at ¶ 11.  The calculation of the dual rate commission structure is determined by adding the gross profit margin and the billable rate.  *Id.* at ¶ 12.  The gross profit margin for a given project is calculated by dividing the project's generated profit by its total sales price.[2]  *Id.* at ¶ 13.  The billable rate is determined by dividing the project's gross profit by the total man hours used to complete the project.  *Id.* at ¶ 14.  With respect to these calculations, CentiMark offers the following by way of example:

> [A] project that sells for $100,000 that generates $36,000 in profit has a gross profit margin of 36%. . . . [I]f 700 man hours were used to complete [a] job . . . that was sold for $100,000 and generated $36,000 in gross profit, then the billable rate would be 51.4 ($36,000 divided by 700). . . .  Under [this] example, the dual rate for the project would be 87.4 [36+51.4].  The dual rate then determines the percentage of the commission as follows:

### 26 JOB COMMISSION STRUCTURE

| COMMISSION RATE | CURRENT DUAL RATE PLAN | NEW DUAL RATE PLAN EFFECTIVE APRIL 1, 2017 |
|---|---|---|
| 0% | less than 65 | less than 68 |
| 2% | 65 to less than 68 | 68 to less than 71 |
| 3% | 68 to less than 71 | 71 to less than 74 |
| 4% | 71 to less than 74 | 74 to less than 77 |
| 5% | 74 to less than 77 | 77 to less than 80 |
| 6% | 77 to less than 80 | 80 to less than 83 |
| 7% | 80 to less than 83 | 83 to less than 86 |
| 8% | 83 to less than 86 | 86 to less than 89 |
| 9% | 86 to less than 89 | 89 to less than 92 |
| 10% | 89 to less than 92 | 92 to less than 95 |
| 11% | 92 to less than 95 | 95 to less than 98 |
| 12% | equal to or greater than 95 | equal to or greater than 98 |
| 15% | greater than 55% GP | greater than 55% GP |

---

[1] The Court notes that Knightly generally does not dispute that CentiMark tracks and takes into account certain financial data associated with CentiMark's projects, but does dispute the accuracy of the tracked and reported data associated with Knightly's projects.  Resp. to Concise Statement ¶¶ 9; 11, ECF No. 92.

[2] For the sake of clarity, the Court notes that CentiMark's submissions indicate that the Dual Rate Commission Plan utilizes a gross profit margin percentage to calculate the "dual rate."  Accordingly, the result of this equation is then multiplied by 100 to calculate a percentage (in the example provided by CentiMark, the result would be $36,000/$100,000 = 0.36; 0.36*100 = 36%).

*Id.* at ¶¶ 13-15.[3]  The parties disagree as to whether, during the timeframe relevant herein, the Dual Rate Commission Plan capped the maximum commission an employee could receive at $50,000 per project.  *Id.* at ¶ 16.

Under the Dual Rate Commission Plan, a commission with respect to a project sold by an employee is deemed earned only after the following events have occurred: (i) the employee must be involved in the delivery of the proposal and/or negotiation of the project award; (ii) the project has a binding contract document to support it; (iii) two months have elapsed from the technical completion ("TECO") date of the project; and (iv) the gross profit for the project is no longer subject to adjustment or change by the customer, vendor, supplier, or manufacturer.  Resp. to Concise Statement ¶ 17, ECF No. 92.  CentiMark's commission payment process begins in the second month following the TECO date.  *Id.* at ¶ 19.  CentiMark's employees could estimate their potential commission payment for a given project based upon the original plan for the project, but any subsequent adjustments or changes with respect to the gross profit would result in recalculation and adjustment of an employee's commission.  *Id.* at ¶ 18.  An employee who disagrees with the commission calculation can request an override from the employee's manager, who in turn presents the override request up the chain of command (to the regional manager and executive vice president for the relevant Group) for consideration.[4]  *Id.* at ¶ 20. The override process gives the regional manager and/or executive vice president discretion to adjust commission payouts.  *Id.* at ¶ 21. During his employment with CentiMark, Knightly utilized the override process, and sometimes benefitted from the process.  *Id.* at ¶¶ 23-24.

---

[3] Because the dual rate for this example is 87.4, the commission rate would be 9% of the gross profit generated by the project under the Dual Rate Commission Plan in place during the timeframe relevant herein.

[4] The Court notes that Knightly does not dispute that an override process existed during the timeframe relevant herein, but does take issue with CentiMark's application of the override process.  Resp. to Concise Statement ¶¶ 20-22, ECF No. 92

CentiMark utilizes a recordkeeping database called SAP R/3, which provides an integrated suite of computer applications to manage important parts of CentiMark, including, but not limited to, sales, commissions, and human resources. Resp. to Concise Statement ¶ 35, ECF No. 92. The SAP R/3 database has a three-tier client/server architecture comprised of a Presentation Tier, a Logic Tier, and a Data Tier. *Id.* at ¶ 37. CentiMark imports various data into the Data Tier, *id.* at ¶ 38, including, apparently, costs, materials, and labor hours associated with specific roofing projects, *see id.* at ¶¶ 40-45.

CentiMark has produced "WebFOCUS reports" for the projects that are relevant in this action. Resp. to Concise Statement ¶ 50, ECF No. 92. WebFOCUS reports retrieve and filter data that is stored in the Data Tier of the SAP R/3 database. *Id.* at ¶ 52. WebFOCUS reports break down the "actual costs" for a project, as they have been entered into the Data Tier, versus the "estimated costs" for the project, and provide additional information to determine how adjustments to a project may have affected the numbers that are used for calculating commissions. *Id.* WebFOCUS reports display the initial estimate for a project and the final cost of the project based upon the data that was entered into the Data Tier, and also include a breakdown of the charges to each customer, including materials, labor, and other costs. *Id.* at ¶¶ 53-54. Knightly had access to WebFOCUS reports during his employment with CentiMark, and, "[w]hen a project did not perform 'the way [it] was supposed to,' for example, [Knightly] would print a WebFOCUS report and talk with James Best, Mark Walsh, or Dave Pineo about it." *Id.* at ¶¶ 55-57.

CentiMark filed its Motion for Summary Judgment, along with a Brief in Support (ECF No. 81), a Concise Statement of Material Facts (ECF No. 83), and an Appendix of Exhibits (ECF Nos. 82 and 85), on January 22, 2021. On February 26, 2021, Knightly filed a Brief in Opposition (ECF No. 91), a Response to CentiMark's Concise Statement (ECF No. 92), and an Appendix of

Exhibits (ECF Nos. 93; 96; and 97).  On March 15, 2021, CentiMark filed Reply Brief (ECF No. 99) and a Reply in Support of its Concise Statement of Material Facts (ECF No. 98).

## II.        Legal Standard

Summary judgment may be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted.  Fed. R. Civ. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998).

The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment.  Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248.

## III.       Discussion

Initially, there is seemingly no dispute that Massachusetts law applies to Knightly's statutory wage claim, and that Pennsylvania law applies to his remaining claims.[5]  Accordingly, the Court will apply Massachusetts law to Count I, and will apply Pennsylvania law to Knightly's remaining claims.  Each of Knightly's claims centers around allegations that CentiMark failed to pay Knightly all commissions he was owed under the Dual Rate Commission Plan from 2015 to 2018.  *See* Compl. ¶¶ 5-38, ECF No. 1-1.

### A.  Massachusetts Wage Act (Count I)

CentiMark argues that it is entitled to summary judgment on Knightly's Massachusetts Wage Act claim because: (1) CentiMark properly paid Knightly in accordance with its Dual Rate Commission Plan; (2) Knightly's commission payment for the T.E. Connectivity project was subject to CentiMark's $50,000 cap on commissions, and Knightly purportedly offers no support for his assertion that the calculation of his commission payment, which was ultimately in excess of the cap following Knightly's override request, was incorrect; and (3) Knightly's "theories about how he was underpaid commissions on other projects are based on nothing more than speculation, rumor, hearsay, and the declarations of individuals who admit they have no [knowledge of] specifics to support [Knightly's] claim."  Br. in Supp. 5, ECF No. 81.

Knightly acknowledges that the Dual Rate Commission Plan was in place during the timeframe relevant herein and does not take issue with the Plan generally; but, rather, takes issue with CentiMark's implementation of the Plan, as well as "the integrity of the numbers fed by [CentiMark] into the Dual Rate Commission Plan that then calculated the commission owed to him."  *See* Br. in Opp'n 5, ECF No. 91.  More specifically, Knightly asserts that: (1) the Dual Rate Commission Plan did not feature a commission cap at the time the T.E. Connectivity project was

---

[5] While Knightly cites to Massachusetts law in discussing contract formation, his briefing otherwise relies entirely on citation to Pennsylvania law.

sold and completed, and that the commission he received for that project was below the value that he should have received, *id.* at 3;[6] (2) CentiMark misapplied the Dual Rate Commission Plan and miscalculated Knightly's commissions for the Clariant and Operation Safe Quarters projects, *id.* at 4-5; and (3) CentiMark misapplied the Plan by inputting incorrect labor hours/costs and material costs into the SAP R/3 database for nineteen specific projects in a manner that reduced Knightly's commission payouts for those nineteen projects, *id.* at 5.   Knightly further asserts that he can establish that he is owed the following commissions: $15,000 for the T.E. Connectivity project; $2,500 for the Clariant project and $658 for the Operation Safe Quarters project; and "[a] sliding scale for an additional 19 projects (excluding T.E. Connectivity) as outlined in the WebFOCUS reports that averages out to roughly a 10.63% reduction in commission per job."  *Id.* at 2-3.

"To establish a Wage Act claim, a plaintiff must show that: (1) he was an employee under the Wage Act; (2) the compensation constitutes wages pursuant to the Wage Act; (3) the Wage Act was violated; and (4) any individual defendants were corporate officers as defined by the statute."  *Ellicott v. Am. Cap. Energy, Inc.*, 906 F.3d 164, 169 (1st Cir. 2018).   With respect to whether payment of commissions constitutes wages, the United States Court of Appeals for the First Circuit has explained:

> Under the Wage Act, "the payment of commissions" represents wages "when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee."  Mass. Gen. Laws ch. 149, § 148 (2009).   Compensation based on commissions has been "definitely determined" when it is "arithmetically determinable."  *Wiedmann v. Bradford Grp., Inc.*, 444 Mass. 698, 831 N.E.2d 304, 312 (2005); *see also McAleer v. Prudential Ins. Co. of Am.*, 928 F.Supp.2d 280, 287 (D. Mass. 2013); *Okerman v. VA Software Corp.*, 69 Mass.App.Ct. 771, 871 N.E.2d 1117, 1124-25 (2007).

---

[6] Knightly alleges that he should have earned a commission of approximately $80,000, due in December 2015 or January 2016, for the T.E. Connectivity project, but that he was only paid approximately $65,000 following his submission of an override request.  Resp. to Concise Statement ¶¶ 25; 29, ECF No. 92; *see also* CentiMark's Ex. 7 at 2, ECF No. 82-7.

> Moreover, a commission is "due and payable" when dependent contingencies have
> been met and it is thus owed to the employee. *See McAleer*, 928 F.Supp.2d at 288.

*Ellicott*, 906 F.3d at 169.  "When a compensation plan specifically sets out the contingencies an

employee must meet to earn a commission, courts apply the terms of the plan, however, when the

plan does not specify, courts generally consider that the employee earns the commission and it

becomes due and payable when the employee closes the sale, even if there is a delay in actual

payment on the sale." *McAleer*, 928 F. Supp. 2d at 289 (citations omitted).

With respect to Knightly's assertion of incorrect material and labor data entry on the

nineteen projects he has specifically identified as purportedly having involved the same, the Court

first acknowledges that CentiMark itself has introduced, and Knightly frequently cites, *see* Br. in

Opp'n 5-7, ECF No. 91, competent deposition testimony that tends to indicate that there existed at

least some general practice or pattern at CentiMark whereby CentiMark employees who worked

in the "operations" section of CentiMark, including operations managers, foremen, and field

supervisors, would shift or misapply material costs and labor hours/costs for projects in a manner

that, while beneficial to the operations team, could negatively impact the commissions received

by CentiMark's sales representatives.  *See* Meck Dep. 23:15-24:19; 62:14-63:20; 191:5-25, ECF

No. 82-9; Mangiaruga Dep. 138:2-140:23; 150:13-152:15, ECF No. 82-10; Bauer Dep. 21:17-

23:12, ECF No. 82-11; Seacor Dep. 58:10-59:19, ECF No. 82-12.  This testimony, however, fails

to identify a single, specific instance of the misconduct on which Knightly bases his claims related

to purported fraudulent data entry/manipulation, and none of these individuals testified as to

personal awareness of any of Knightly's specific projects being affected by such conduct, *see*

Meck Dep. 176:17-19, ECF No. 82-9 ("Q: So with respect to Mr. Knightly, do you recall ever

moving labor costs for Mr. Knightly[?]" "A: No.").  The Court further notes that Knightly has

chosen nineteen specific projects which he asserts were "suspicious," CentiMark's Ex. 7 at 2, ECF

No. 82-7; ECF No. 97-3, but offers no evidence that could support a finding that any of these specific projects, in fact, involved the labor and material cost shifting/misapplication that Knightly asserts as his basis for recovery under the Massachusetts Wage Act.[7]  More specifically, Knightly has set forth no basis upon which a factfinder could conclude that Knightly earned, and should have been paid, a commission other than what he was paid for these specific projects.

Knightly bases his claim that CentiMark owes him additional commissions on these nineteen projects, which are identified at Paragraph 30 of Knightly's Response to CentiMark's Concise Statement, generally on "planned commissions."  *Id.* at ¶ 31.  Knightly's "estimate of the 'planned commission' is based on his calculation of what his commission would have been if the original plan would have occurred—in other words, it is what his commission would have been based on his initial estimate for the project."  *Id.* at ¶ 32; *see also* Br. in Opp'n 5, ECF No. 91 ("Plaintiff has identified 19 specific jobs that his commissions were reduced, and Defendant has produced reports, called Web Focus Reports, that indicate *how Plaintiff sold the job versus how the job actually performed*." (emphasis added)).   The amounts Knightly believes he was underpaid for these specific projects represent the difference between the planned commission and the actual commission.  Resp. to Concise Statement ¶ 33, ECF No. 92.  Knightly asserts that he should be paid his planned, estimated commissions for these nineteen projects, and further asserts that the

---

[7] *See* Resp. to Concise Statement ¶ 60, ECF No. 92 (CentiMark avers that "Plaintiff can identify just one project on his list of 20 for which he believes CentiMark's numbers are inaccurate.  Even then, Plaintiff is only 'pretty sure it was Doubletree[,]'" and Knightly responds: "Denied.  Plaintiff can also point to the T.E. Connectivity job, the Clariant job, and the Operation Safe Quarters job." (citations to record omitted)).  The Court notes that Knightly's response to ¶ 60 of CentiMark's Concise Statement is essentially an admission that Knightly has submitted no evidence of inaccurate data entry for eighteen of the nineteen projectts that he asserts involved the same.  Moreover, Knightly's testimony as to the purported inaccurate data entry for the project he is "pretty sure" was Doubletree is, at best, equivocal, and is further based upon a purported comment allegedly made by an operations team member, the only person with purported firsthand knowledge, to a foreman, who then relayed the comment to a colleague of Knightly, who then informed Knightly of the same.  *See* Knightly Dep. 123:8-124:9, ECF No. 82-2.  This hearsay evidence is not sufficient to support an inference that improper data entry occurred for the Double Tree project.  *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment.").

final numbers in the WebFOCUS are inaccurate because they feature misapplied material costs and/or labor costs/hours for these projects.  Br. in Opp'n 5, ECF No. 91.  Knightly asserts that each of the projects identified by Knightly underperformed with respect to Knightly's initial projection of his estimated commission by an average reduction, per project, of approximately 10.63%.  *Id.* at 8.

While Knightly bases his Wage Act claim related to improper data entry/manipulation on his estimates and planned commissions for the nineteen projects he has identified as "suspicious," the Court notes that no party challenges, in any material respect, that the final, "actual" values and costs listed on the WebFOCUS reports, and not the estimated values and costs, are utilized to calculate the commission that is ultimately paid to CentiMark's sales employees.  Moreover, the record before the Court indicates that these final, "actual" values were, in fact, used to calculate Knightly's commissions.[8]  Knightly merely takes issue with the accuracy of these final, "actual" values.  Knightly, however, bears the burden of establishing a violation of the Massachusetts Wage Act, that is, that he was not paid the full amounts of the appropriate commissions due to him under the Dual Rate Commission Plan for the nineteen projects at issue.  Knightly offers no direct evidence of improper data manipulation with respect to any of the nineteen specific projects at issue in this matter.  Knightly also fails to offer any direct evidence as to the actual performance of any of these projects, such that the factfinder might be able to conclude that the labor and material costs for these projects were artificially or unnecessarily inflated from Knightly's initial

---

[8] The Court notes that, according to Knightly, override requests were granted as to five of the nineteen projects identified by Knightly as suspicious.  *See* CentiMark's Ex. 7 at 2, ECF No. 82-7.  Outside of the Operation Safe Quarters project and the Clariant project, which will be addressed in further detail below, Knightly offers no evidence whatsoever as to these overrides generally or why they were granted, and further offers no evidence that could possibly permit a factfinder to conclude that the commissions paid via the override process were for some reason incorrectly calculated or that they involved fraudulent data entry.

estimate.[9]   Nor is there any of evidence of record to indicate how often a salesperson's initial estimate of the gross profit margin and billable rate matches the final result, or how often the estimate and actual final numbers are disparate and by how much.   In summary, Knightly has chosen nineteen underperforming projects that he is dissatisfied with and believes should have paid a higher commission, but offers no direct evidence as to these projects' actual performance, and fails to offer direct evidence or sufficient contextual evidence which might permit a factfinder to conclude that these jobs were, in fact, subject to fraudulent data input.

For his part, Knightly seems to acknowledge that some evidence as to data manipulation and/or the performance of the nineteen specific projects he has identified as "suspicious" is necessary to determine whether a Wage Act violation has taken place with respect to those nineteen projects.[10]   *See* CentiMark's Ex. 7 at 2, ECF No. 82-7. ("As it relates to 'the amount that you allege that you should have been paid as a commission[,]' I can only base that, generally, on planned commission.   Scrutiny of job costs and some forensic accounting would be needed to identify 'every instance' and determine what I 'should' be paid.   My allegations are that these practices are widespread, not unique to me, so in that sense all projects are deserving of scrutiny.   Setting that aside for now, these are a few I am specifically suspicious of."); *see also id.* at 7 ("Scrutiny of job costs and some forensic accounting would be needed to further quantify damages.").   In short, Knightly's claims related to misapplication of material costs and labor costs and hours are purely speculative in nature.[11]   Knightly merely points to nineteen "suspicious," underperforming projects

---

[9] The Court perceives that there exist several legitimate, non-fraudulent causes for labor and material costs or labor hours to exceed a salesperson's initial estimates.

[10] "[T]he non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion." *Conley v. City of Erie, Pa.*, 521 F. Supp. 2d 448, 451 (W.D. Pa. 2007) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989)).

[11] "Inferences based upon speculation or conjecture do not create a material factual dispute sufficient to defeat a motion for summary judgment." *Cmty. Vocational Sch. of Pittsburgh, Inc. v. Mildon Bus Lines, Inc.*, 307 F. Supp. 3d 402, 413 (W.D. Pa. 2018) (citing *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)).

and testimony that there existed at least some general practice or pattern of improper data entry at CentiMark, but fails to offer any evidence to tie the two together. On the record before Court, the Court cannot conclude that Knightly has produced evidence which could possibly permit the factfinder to conclude that Knightly should have been paid commissions other than the commissions he actually received for the specific nineteen jobs that he has asserted involved potential improper labor and materials data entry. The Court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. In light of the above, the Court concludes that CentiMark is entitled to summary judgment as to Knightly's Massachusetts Wage Act claim asserting improper labor and materials data entry.

With respect to the other projects identified by Knightly as those he was purportedly underpaid for, specifically the T.E. Connectivity project, the Clariant project, and the Operation Safe Quarters project, Knightly asserts that the commissions for the Clariant and Operation Safe Quarters were incorrectly calculated by CentiMark (even when utilizing the final, "actual" values reflected in the WebFOCUS Reports). Br. in Opp'n 3-5, ECF No. 91. Knightly further asserts that CentiMark subjected the T.E. Connectivity project to a purportedly non-existent commission cap. *Id.*

The Court finds that genuine issues of material fact preclude summary judgment in CentiMark's favor at this time with respect to the Operation Safe Quarters project. Knightly has submitted evidence, specifically an email chain in which his override request for that project was approved, *see* ECF No. 97-2, that indicates, rather blatantly, that the commission provided via the override process to Knightly for the Operation Safe Quarters project was simply miscalculated. In that email chain, Knightly's superior recommended an override commission payout of 6% based

upon his calculations of final "actual" values, and the override was approved by CentiMark's executive vice president. *Id*. Knightly asserts, and Knightly's superior eventually admitted,[12] that Knightly's superior incorrectly calculated Knightly's updated commission. *Id*. Specifically, Knightly's superior recommended that Knightly should be paid a 6% commission under the Dual Rate Commission Plan, when the commission should have been 7%.

The Court notes that there is not enough evidence of record for this Court to fully evaluate the nature and function of the override process at CentiMark. CentiMarrk seems to argue that the override process is completely discretionary, and that CentiMark can assign whatever commission it wants by way of the override process. Construing the evidence in a light most favorable to Knightly, as this Court must do at this juncture, it certainly seems, however, that the override process exists, at least to a certain extent, to correct errors in the calculation of the commission that is due to an employee under the Dual Rate Commission Plan, and that the same occurred for the Operation Safe Quarters project. Knightly's supervisor acknowledged his mathematical error in the email thread, and the parties clearly utilized the Dual Rate Commission Plan calculations to arithmetically determine the amount of the Operation Safe Quarters commission provided via the override process. "Compensation based on commissions has been 'definitely determined' when it is 'arithmetically determinable.'" *Ellicott*, 906 F.3d at 169 (*Wiedmann v. Bradford Grp., Inc.*, 444 Mass. 698, 831 N.E.2d 304, 312 (2005)). As such, the evidence of record establishes that there is a genuine issue of material fact as to whether Knightly was paid the correct commission for the Operation Safe Quarters project under the Dual Rate Commission Plan, and the Court will deny CentiMark's Motion for Summary Judgment as to that project.

---

[12] And this Court's calculations tend to confirm.

With respect to the T.E. Connectivity project, CentiMark asserts that "[Knightly] submitted an override request and ended up receiving a commission that was above the $50,000 cap, and [Knightly] admits that he received more than the cap but argues it should have been more without any evidence of any entitlement to more."  Br. in Supp. 5, ECF No. 81.  Initially, the evidence before the Court, especially when considered in a light most favorable to Knightly, establishes a genuine issue of material fact as to whether any commission cap was actually in place at CentiMark during the timeframe relevant herein.  The evidence tends to indicate that the commission cap was not mentioned in the 2013 written description of the Dual Rate Commission Plan that was in place during the timeframe relevant herein, *see* ECF No. 97; ECF No. 82-13, and the only documentary evidence submitted by CentiMark which tends to substantiate the existence of the cap is a 2004 memorandum[13] (ECF No. 85-1) that was sent to the sales team to reiterate the cap's purported existence.  The record also contains evidence that indicates that Knightly was not aware of the cap's existence, and that the cap was not applied with regularity.  CentiMark has provided no evidence of any project where the cap was actually applied, and, as averred by CentiMark, Knightly, in fact, received a commission for the T.E. Connectivity project that was in excess of the $50,000 cap.

The Court further disagrees with CentiMark's assertion that there is no evidence of record that Knightly was entitled to receive a commission that was higher than the commission he was ultimately paid ($65,088.46) for the T.E. Connectivity project via the override process.  The Court finds the actual commission that was paid to Knightly through the override process to be illuminating.  The records submitted by Knightly clearly indicate that he was paid *exactly* half

---

[13] Knightly began his employment with CentiMark in 2011, Resp. to Concise Statement ¶ 3, ECF No. 92, and thus would not have received this memorandum when it was initially circulated in 2004.

($15,088.46) of what his "excess commission"[14] would have been, under the Dual Rate Commission Plan (and utilizing the final, "actual" values), had CentiMark not initially attempted to enforce the purported commission cap. *See* ECF No. 97-4 at 4. CentiMark seemingly argues that this override payment was simply a discretionary "bonus." The Court again notes that there is limited evidence of record as to the function and purpose of CentiMark's override process, and the Court cannot determine, on this record, whether the override process exists *only* to pay discretionary bonuses as opposed to the correctly calculated commissions due to an employee under the Dual Rate Commission Plan. Further, and importantly, both CentiMark's briefing and the documentation submitted by Knightly, *see* ECF No. 97-4 at 4, characterize the sum of $65,088.46 that was paid to Knightly for the T.E. Connectivity project as a "commission." This is significant because the 2004 commission cap memorandum provides that, while CentiMark may decide to issue bonus pay in its discretion, the "maximum *commission* payout" is capped at $50,000, ECF No. 85-1 (emphasis added). The $65,088.46 paid to Knightly has only been described in the record as a "commission." This evidence, when construed in a light most favorable to Knightly, supports an inference that the commission cap, to the extent it was in place, was simply not applied to the T.E. Connectivity project. [15]

In light of the above, the Court concludes that there exists a genuine issue of material fact as to whether a $50,000 commission cap was in place at CentiMark during the timeframe relevant herein. There is also a genuine issue of material fact as to whether the purported cap was, in fact, applied to the T.E. Connectivity project, or whether it was "lifted." The evidence of record is clear that Knightly was paid exactly 50% of the possible $30,176.92 "excess commission" he would

---

[14] By "excess commission," the Court refers to the amount of the commission Knightly would have received above the purported $50,000 cap for the T.E. Connectivity Project, specifically $30,176.92.

[15] The Court notes that CentiMark's executive vice president, in considering the override request for the T.E. Connectivity Project, stated that he discussed "getting the cap lifted" with the president. *See* ECF No. 97-4 at 1.

have been entitled to under the Dual Rate Commission Plan for the T.E. Connectivity project in the absence of a commission cap. CentiMark's only basis for paying such a commission is its purported application of this commission cap. On this record, the Court cannot conclude that CentiMark has established that Knightly has failed to create an issue of material fact as to whether he was entitled to a higher commission for the T.E. Connectivity project. CentiMark's Motion for Summary Judgment will be denied as to that project.

Finally, with respect to the Clariant project, the Court finds that Knightly has not come forward with sufficient evidence to permit an inference that he was underpaid for that project. Knightly's argument that he should have received a higher commission for the Clariant project is seemingly based on his assertion that the Dual Rate Commission Plan is inequitable because extra labor hours were incurred during Clariant project for unexpected snow and ice removal, which benefited operations and generated revenue, but also increased labor costs and thus decreased Knightly's commission. *See* ECF No. 97-1. Knightly argues that the increased labor costs for the Clariant project were not attributable to him, and that, but for someone else's mistake, he would have been able to earn a higher commission. *See* Br. in Opp'n 4, ECF No. 91; *see also* Resp. to Concise Statement ¶ 31, ECF No. 92. The Court agrees with CentiMark, *see* Reply 9-10, ECF No. 99, that Knightly does not dispute that these costs were, in fact, incurred on the Clariant project. Further, as noted above, commissions are calculated using the final, "actual" values and costs for projects, and not the estimated values and costs. All of the evidence before the Court indicates that Knightly's commission for the Clariant project was calculated utilizing the project's final, "actual" values and costs in accordance with the Dual Rate Commission Plan. While Knightly may find it inequitable that his commission was ultimately decreased by the costs necessitated by snow and ice removal, the Court finds that he fails to submit evidence that creates a genuine issue

of material fact as to whether he is entitled to an increased commission under the Dual Rate Commission Plan for the Clariant project. CentiMark's Motion for Summary Judgment will be granted as to Knightly's Massachusetts Wage Act claim related to this project.

### B. Breach of Contract (Count II)

CentiMark argues that Knightly's breach of contract claim fails for the same reasons that his claim under the Massachusetts Wage Act fails, that is, that Knightly "cannot show that CentiMark breached any contractual duty to him with regard to the payment of his commissions." Br. in Supp. 16, ECF No. 81. This argument is the only basis for summary judgment asserted by CentiMark with respect to Knightly's breach of contract claim. Knightly asserts that he was entitled to commissions pursuant to a contract with CentiMark, and that CentiMark has both violated the Wage Act and breached its contract with Knightly by failing to pay such commissions. Br. in Opp'n 9, ECF No. 91. Accordingly, the parties agree that Knightly's breach of contract claim's viability is entirely dependent on the viability of Knightly's Massachusetts Wage Act claim. For the reasons discussed above with respect to Knightly's Massachusetts Wage Act claim, the Court agrees with CentiMark that Knightly cannot maintain a breach of contract claim for the Clariant project or the nineteen projects specifically identified by Knightly as purportedly featuring improper data input with respect labor hours/costs and material costs. As the Court has found that Knightly's Massachusetts Wage Act claim related to the T.E. Connectivity project and the Operation Safe Harbor project will survive summary judgment, so too will Knightly's breach of contract claim related to these projects.

### C. Breach of the Covenant of Good Faith and Fair Dealing (Count III)

CentiMark argues that Knightly's claim for breach of the covenant of good faith and fair dealing fails because it is identical to his breach of contract claim, and thus fails for the same

reasons that his breach of contract claim fails, and also asserts that it is entitled to summary judgment as to Count III because Knightly fails to set forth an independent cause of action at Count III.  Br. in Supp. 16-17, ECF No. 81.  The Third Circuit has explained:

> Courts have utilized the good faith duty as an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action, but that duty is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term.  Thus, a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are "identical to" a claim for "relief under an established cause of action."

*Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91–92 (3d Cir. 2000).

Knightly offers no opposition to CentiMark's argument that his breach of the covenant of good faith and fair dealing claim fails to state an independent cause of action.  Knightly's allegations in support of his breach of the covenant of good faith and fair dealing claim are identical to those that support his breach of contract claim.  The Court will thus grant CentiMark's Motion for Summary Judgment as to this claim on the basis that it fails to state an independent cause of action.

### D. Quantum Meruit (Count IV)

CentiMark argues that Knightly's quantum meruit claim fails because: (1) the relationship between Knightly and CentiMark was governed by a contract; (2) CentiMark paid Knightly in accordance with the Dual Rate Commission Plan; and (3) Knightly cannot establish that he conferred any benefits on CentiMark, or that it would be inequitable to allow CentiMark to retain any such benefits.  Br. in Supp. 18, ECF No. 81.  In support of his quantum meruit claim, Knightly argues:

> Here, Plaintiff was induced to sell large projects so that he would earn a high commission.  He had no knowledge of the cap, and relied, to his detriment, on the commission plan which was silent as to the cap.  This necessarily means that a jury must consider whether CentiMark was unjustly enriched as the result of its failure to pay Plaintiff.

Br. in Opp'n 10, ECF No. 91.

"Courts treat claims of quantum meruit and unjust enrichment synonymously." *Loeffler Thomas P.C. v. Fishman*, No. CV 15-5194, 2016 WL 1457895, at *11 (E.D. Pa. Apr. 12, 2016) (citing *Mitchell v. Moore*, 729 A.2d 1200, 1202 n.2 (Pa. Super. Ct. 1999); *Powers v. Lycoming Engines*, 328 Fed.Appx. 121, 126 (3d Cir. 2009)).  The Third Circuit has explained:

> The elements necessary to prove that a party is entitled to recovery on the basis of the equitable doctrine of unjust enrichment are: (1) benefits conferred on one party by another; (2) appreciation of such benefits by the recipient; and (3) acceptance and retention of these benefits in such circumstances that it would be inequitable for the recipient to retain the benefits without payment of value.

*Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 277 (3d Cir. 2007) (citing *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir.2000)).  The quasi-contractual doctrine of unjust enrichment is "inapplicable when the relationship between parties is founded on a written agreement or express contract."  *Vives v. Rodriguez*, 849 F. Supp. 2d 507, 516 (E.D. Pa. 2012) (quoting *Schott v. Westinghouse Elec. Corp.,* 436 Pa. 279, 259 A.2d 443, 448 (1969)).

As noted above, however, Knightly asserts that he was entitled to commissions pursuant to a contract with CentiMark, and that CentiMark has both violated the Wage Act and breached its contract with Knightly by failing to pay such commissions.  Br. in Opp'n 9, ECF No. 91.  There can be no doubt that Knightly and CentiMark's relationship was governed by contract.  Whether that contract includes a commission cap and whether Knightly was paid the appropriate commissions for the T.E. Connectivity project and the Operation Safe Harbor project under the Dual Rate Commission Plan are issues that will be resolved in the context of Knightly's Massachusetts Wage Act claim and his breach of contract claim.  The quasi-contractual doctrine of unjust enrichment is "inapplicable when the relationship between parties is founded on a written agreement or express contract." *Vives*, 849 F. Supp. 2d at 516.  Because Knightly and CentiMark's

employment relationship, including CentiMark's payment of commissions to Knightly, was governed by contract, the Court will grant CentiMark's Motion for Summary Judgment as to Knightly's quantum meruit claim.

## IV.    Conclusion

For the reasons discussed above and consistent with the Court's discussion above, the Court will grant in part and deny in part CentiMark's Motion for Summary Judgment.  An appropriate Order of Court follows.

BY THE COURT:

s/*Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: January 10, 2022

cc: All counsel of record